**SO ORDERED.**

**SIGNED this 12th day of January, 2026.**



Dale L. Somers
United States Chief Bankruptcy Judge

Designated for online publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

Absolute Dimensions, LLC,                    Case No. 24-10392-11

Debtor.

**Memorandum Opinion and Order
Denying the U.S. Trustee's Motion to Dismiss and
Overruling Objections to Confirmation of
Debtor's Third Amended Subchapter V Plan**

Both the U.S. Trustee and the Subchapter V Trustee object to

confirmation of the third amended plan of Debtor Absolute Dimensions, LLC.

The U.S. Trustee also moves to dismiss Debtor's case under 11 U.S.C. §

1112(b) for cause,[1] based solely on Debtor's failure to timely file monthly operating reports. After an evidentiary hearing on the matters,[2] the Court denies the U.S. Trustee's motion to dismiss[3] and overrules the objections to confirmation of the third amended plan.[4]

Debtor filed its Chapter 11 Subchapter V case in May 2024, over eighteen months ago. And while Debtor's *first* proposed plan was timely filed in August 2024, the matter was regularly continued as amended plans were filed, until the Court now considers a third amended plan in this case.[5] If any creditor, the U.S. Trustee, or the Subchapter V Trustee had asked for an earlier evidentiary hearing on the issues in this case, Debtor would have come up woefully short in gaining confirmation: Debtor rarely cash flowed, regularly failed to timely pay all obligations as they arose, and ignored issues

---

[1] Future statutory references are to the Bankruptcy Code, title 11, unless otherwise specified.

[2] Debtor appears by Nicholas R. Grillot of the Hinkle Law Firm, L.L.C. The U.S. Trustee appears by John Nemecek and the Subchapter V Trustee, Kent L. Adams, appears personally.

[3] Doc. 126.

[4] Doc. 160 (Debtor's Third Amended Subchapter V Plan), Doc. 169 (U.S. Trustee Objection to Confirmation), Doc. 170 (Subchapter V Trustee's Objection to Confirmation).

[5] A Subchapter V plan must be filed must be filed by a debtor within ninety days of the petition, per § 1189(b), although a court may "extend the period if the need for the extension is attributable to circumstances for which the debtor should not justly be held accountable." Section 1121, however, which places limits on when a Chapter 11 debtor must obtain acceptance of its plan, is not appliable to Subchapter V cases per § 1181(a).

and potential problems until they became major problems. But the parties at issue were willing to make agreements and delay this Court's consideration of the evidence, and ultimately, Debtor has proposed a feasible plan to this Court. In other words, if any party had requested an earlier hearing, this case would not have survived, but because Debtor has been given significant time to right the ship, its third amended plan has satisfied the confirmation requirements and Debtor avoids dismissal.

Some would argue the delay allowed the right outcome. If the goals of the Bankruptcy Code are reorganization and the fair treatment of creditors, and not only has no creditor complained while Debtor stabilized its operations, but also all creditors accept their treatment under the plan ultimately considered, then perhaps the system has worked as intended. That said, the Court acknowledges the purpose of Subchapter V of Chapter 11 is an "accelerated process" designed "to facilitate quicker and cheaper reorganizations."[6] That did not happen here. Likely the Court will not be willing to permit extensions for amended plans or delays in Subchapter V cases in the future, to discourage such lengthy delays.

---

[6] *In re Trepetin*, 617 B.R. 841, 846-47 (Bankr. D. Md. 2020) (reviewing scant legislative history and analyzing Subchapter V to conclude the court would "balance these goals of speed and access to a realistic reorganization scheme").

3

## I. Procedural Background

Debtor, a machine shop manufacturing aeronautical parts, filed a prior Chapter 11 bankruptcy case on March 29, 2019.[7] A reorganization plan was confirmed in that case in January 2020 and a final decree was entered on May 18, 2020, closing the prior case.

Debtor filed its petition for relief in this current Chapter 11 case on May 8, 2024, electing to proceed as a small business debtor under Subchapter V. Over the course of the next year, Debtor filed four proposed repayment plans, each of which drew multiple objections to confirmation, the confirmation hearings were then continued, and each plan was subsequently amended again. The U.S. Trustee, in May 2025, then filed a motion to dismiss,[8] arguing cause existed to dismiss Debtor's case based solely on Debtor's failure to timely file monthly operating reports.

After reaching an agreement early on with its primary secured creditor Emprise Bank,[9] and resolving issues raised by the U.S. Department of

---

[7] Case No. 19-10489.

[8] Doc. 129.

[9] Doc. 103.

4

Labor[10] and Debtor's landlord,[11] on September 23, 2025, over a year and four months post-filing, Debtor filed a third amended plan of reorganization.[12]

Objections to confirmation of the third amended plan were filed by both the U.S. Trustee and the Subchapter V Trustee.[13] The U.S. Trustee argued the third amended plan lacked feasibility and failed to pay the required liquidation value,[14] and the Subchapter V Trustee's objection also argued the third amended plan was not feasible.[15]

---

[10] *See* Doc. 112. Per the agreement with the U.S. Department of Labor, Debtor agreed to pay $88,534.48 with interest at 7.38 percent over seven years, with eighty-four equal monthly payments. *Id.* at 3.

[11] *See* Doc. 163. Per the agreement with its landlord, Debtor is obligated to timely make payment of its ongoing monthly lease obligations beginning in September 2025, and in addition, a postpetition delinquency of $120,809.73 is to be paid in monthly installments over twenty-four months, with payments of $5033.74 per month beginning in October 2025. *Id.* p. 2.

[12] Doc. 160.

[13] Doc. 169 (U.S. Trustee), Doc. 170 (Subchapter V trustee).

[14] The U.S. Trustee also argued the third amended plan (1) contained an impermissible nonconsensual injunction in violation of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), (2) included an overbroad exculpation clause, (3) had discharge provisions inconsistent with Local Rules, (4) had an inappropriate exclusive jurisdiction provision, and (5) proposed to pay the Subchapter V Trustee's expenses over the life of the plan as funds were available and the Subchapter V Trustee did not consent to that treatment. At the evidentiary hearing, the parties announced all issues other than feasibility and the liquidation analysis had been resolved, although the parties did not inform the Court of the specifics of the language agreed upon or the terms of the agreement concerning payment of the Subchapter V trustee fees.

[15] Like the U.S. Trustee, the Subchapter V Trustee also objected to confirmation because he did not agree to the proposed treatment of his administrative fee claim, but again, an agreement was announced at the evidentiary hearing, without giving particulars.

The Court held an evidentiary hearing on both the motion to dismiss and the confirmation of the third amended plan. Debtor's managing partner, Stephen Brittain, and its office manager, Miranda Brittain, both testified on behalf of Debtor. At the conclusion of the hearing, the Court took the pending matters under advisement.

## II. Findings of Fact

Debtor has been in operation for twenty-one years, starting out as a service business, where customers provided the materials and Debtor manufactured machine parts on the customer's behalf and then shipped those parts back to the customer. As Debtor's business grew, it began doing contract work, where Debtor bought the materials and made the parts, then stored those manufactured pieces in its inventory for sale to its customers. In 2013 to 2014, Debtor's customer base began to include Spirit AeroSystems (Spirit), and Debtor's business grew from about $1 million a year to $6 million a year because of contract work with that customer.

Debtor's business became largely dependent on, and intertwined with, Spirit. In 2018, prior to its first bankruptcy case, Debtor's "vendor-owned" inventory amount with Spirit "soared"—at that point, the inventory had been delivered and was sitting on the shelves at Spirit, but Debtor would not get paid until the inventory was actually used, and Debtor had no control over

6

the usage or timing of the use of the inventory. Debtor then lost its line of credit and ultimately filed its first bankruptcy case in March 2019.

The confirmed plan in Debtor's first bankruptcy case anticipated all general unsecured creditors would be paid in full. The plan was confirmed in March 2020, just before the airline industry was significantly impacted by the Covid pandemic. Throughout 2021 and 2022, Debtor attempted to survive with contract work, but not only did the cost of goods spike between 2021 and 2022,[16] in 2023, two additional events further impacted Debtor's ability to operate. First, Debtor's landlord sold the building Debtor leased and Debtor was forced to move to a new location in the summer of 2023. Second, Debtor's contract work with Spirit was terminated by Spirit, and Debtor was left with significant inventory on the shelf.

These events forced Debtor to change its business model in late 2023, by going back to the service business in which it started. But doing so came with its own costs: the development of parts and programs requires a high startup cost, and Debtor transitioned from thirty to forty employees to five to six employees. Debtor's current bankruptcy was filed in May 2024 because of this transition.

---

[16] In 2021, Debtor reported gross sales of $2.6 million with a $1.7 million cost of goods. In 2022, the gross sales showed an increase to $3.1 million, but the cost of goods spiked to $4.1 million.

Case 24-10392    Doc# 183    Filed 01/13/26    Page 7 of 30

Debtor acknowledges its monthly cash receipts and disbursements varied widely in the first year after the current petition was filed, and as a result, some months Debtor had *net* income just over $26,000 while some months Debtor had a net income as low as *negative* $13,500. Debtor's postpetition monthly cash receipts have ranged from lows of about $43,000 to highs of about $95,000. The *average* cash receipts reported from May 2024 through September 2025 in Debtor's Monthly Operating Reports (MORs) is $68,349.15. Debtor's *average* postpetition monthly disbursements have generally fallen around those same ranges, with a monthly average disbursement reported from May 2024 through September 2025 of $63,486.69. That said, the averages do not paint the full picture. For six of the seventeen postpetition months, Debtor reported a negative monthly net income, ranging from -$4,291 to -$13,541.84.

In addition to those wide variances, however, Debtor admits its monthly operating reports were not accurate.[17] The only postpetition months in which Debtor fully paid all its obligations were just after the May 2024 filing of its petition in this case, in June and July 2024. Beginning in August

---

[17] Beginning in December 2024, Debtor also incorrected listed its outstanding postpetition accounts payable as $630,247.04, which was the amount of debt addressed in Debtor's first bankruptcy filing. Debtor admits it should not have reported that prepetition debt in this postpetition report and simply did not catch that it was reporting an incorrect number.

8

2024, Debtor stopped paying its monthly lease obligations, which totaled about $10,731 each month.[18] A full year later, after its landlord filed a motion seeking administrative expenses and a motion seeking relief from stay in September 2025, Debtor began paying its lease obligations, and beginning in October 2025, has agreed to make catchup payments of an additional $5033.74 per month. But around the time Debtor started making those monthly lease obligations in September 2025, it stopped paying its weekly taxes on employee withholding, and Debtor has not paid its employer contributions for its employee payroll taxes for the second and third quarter of 2025. Debtor estimates the postpetition tax obligation to be about $60,000, but did not address any plan to get caught up on that postpetition delinquency.

Debtor's third amended plan pays its secured creditors, priority creditors, and then Debtor's projections are to pay $25,000 to general unsecured creditors. This payment to general unsecured creditors will consist of the disposable income Debtor projects from 2028, 2029, and 2030. In other words, general unsecured creditors will receive no payments until at least 2028.

---

[18] This figure includes base rent, property taxes, and utilities paid to the landlord.

## III. Conclusions of Law

Core proceedings include "matters concerning the administration of the estate" and "confirmations of plans" under 28 U.S.C. § 157(b)(2)(A) and (L), over which this Court may exercise subject matter jurisdiction.[19]

### A. Dismissal for Cause under § 1112(b)(4)(F)

The U.S. Trustee's motion to dismiss was filed May 5, 2025, seeking dismissal for cause under § 1112(b) for Debtor's failure to timely file Monthly Operating Reports. At the time the motion was filed, Debtor's 2024 MORs were filed late, and Debtor had not filed any MORs—at all—in 2025. On June 2, 2025, Debtor filed a response to the U.S. Trustee's motion, arguing cause did not exist for dismissal and noting its January, February, and March 2025 MORs had just been filed. After that, Debtor filed its May and June 2025 MORs on August 12, 2025, and the July 2025 MOR on October 22, 2025. The August and September 2025 MORs were filed just before the evidentiary hearing, on November 4, 2025, and the October 2025 MOR was filed on

---

[19] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1 *printed in* D. Kan. Rules of Practice and Procedure (March 2018).

November 26, 2025. Most of the MORs that were filed in Debtor's case were filed late.

The U.S. Trustee's motion seeks dismissal under § 1112(b)(1), which states "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause." Section 1112(b)(4) provides several examples of cause, and the U.S. Trustee's motion exclusively relies on subsection (b)(4)(F), the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." The burden of proof on the U.S. Trustee's motion rests with the U.S. Trustee.[20]

Debtor's MORs are required by § 704(a)(8),[21] made applicable in Chapter 11 by §§ 1106(a)(1) and 1107(a),[22] and by Federal Rule of Bankruptcy Procedure 2015(a)(3) which requires a debtor-in-possession to file

---

[20] *In re Bushyhead*, 525 B.R. 136, 137 (Bankr. N.D. Okla. 2015) ("The burden of proof in this action is upon the United States Trustee to show cause for dismissal of this case by a preponderance of the evidence.").

[21] Under § 704(a)(8), "if the business of the debtor is authorized to be operated," then "periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires" must be filed.

[22] Under § 1106(a)(1), a Chapter 11 trustee is required to perform the duties required by § 7014(a)(8), and then under § 1107, the debtor in possession has the rights and duties of a Chapter 11 trustee.

11

periodic financial reports.[23] A failure to timely file MORs can be cause for dismissal under § 1112(b).[24]

Once a movant establishes cause under § 1112(b)(1), a court must consider subsection (b)(2) of § 1112. Under § 1112(b)(2), a debtor's case can survive dismissal, even in the face of deficiencies that warrant it, if "the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate" and the debtor can prove that: (1) there is a reasonable likelihood that a plan is confirmable and (2) there is a "reasonable justification" for the deficiency and that the deficiency will be cured within a reasonable time.

At the evidentiary hearing on these matters, the U.S. Trustee did not ask questions or present documentary evidence about the status of, timing of filing, or any missing MORs. Rather, the U.S. Trustee focused on the accuracy of the MORs that were filed. In each MOR filed in this case, Debtor answered "yes" to questions asking if all bills had been paid on time and if Debtor was current on all tax obligations. But beginning in August 2024 and continuing through August 2025, Debtor did not pay its lease obligations at

---

[23] Under Fed. R. Bankr. P. 2015(a)(3), a "debtor in possession must . . . (3) file: (A) the reports and summaries required by § 704(a)(8)."

[24] *In re Whetten*, 473 B.R. 380, 384 (Bankr. D. Colo. 2012) ("[F]lagrant disregard of a debtor-in-possession's reporting duties may by itself constitute sufficient 'cause' for dismissal or conversion under §§ 1112(b)(4)(F) & (H).").

all. In September 2025, Debtor began paying its lease obligations, but stopped paying its payroll taxes, which remained delinquent at the time of the evidentiary hearing on the motion. In other words, other than the first two months postpetition, Debtor has not timely paid *all* its bills on time— Debtor has either not paid rent or did not pay payroll taxes—and therefore answering "yes" on the MOR was not accurate.

The Court declines to find cause based on the timely failure to file MORs – all MORs have been filed, and Debtor was caught up on its reporting requirements long before the hearing on the motion to dismiss.[25] And while inaccuracy in a MOR can constitute cause for dismissal as it is an example of gross mismanagement,[26] the U.S. Trustee has not sought dismissal on that

---

[25] Even if cause to dismiss had been shown under § 1112(b)(1), the Court concludes under § 1112(b)(2) that there is a reasonable likelihood Debtor's third amended plan is confirmable, there was a reasonable justification for the deficiency, and the deficiency has been cured. Debtor's office manager testified as to her mistake in answering "yes" to the postpetition obligation question and committed to accuracy within the MORs and the timely filing of the MORs going forward.

[26] *See In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 859 (Bankr. S.D. Tex. 2023) ("[N]umerous inaccuracies in Debtor's MORs can demonstrate gross mismanagement when paired [with] misconduct that leaves the Court and all parties in interest with an inaccurate picture of Debtor's financial condition."). *See also In re DRTMG, LLC*, 667 B.R. 862, 572-74 (Bankr. S.D. Ohio 2025) (citing cases discussing importance of timely filing of accurate MORs and finding cause for dismissal under § 1112(b)(4)(F) based on untimely, incomplete, and inaccurate MORs that were not corrected despite notifications from the U.S. Trustee and the Subchapter V trustee; cause for dismissal was also found based on gross mismanagement due to "the failure to file timely, complete, and accurate monthly operating reports [which] also demonstrates gross mismanagement where that failure results in a materially inaccurate financial picture or where other acts in violation of the Code are hidden").

13

basis. As a result, the Court denies the U.S. Trustee's motion to dismiss made under § 1112(b)(4)(F) and instead considers the inaccuracies in the MORs as they relate to confirmation of the proposed third amended plan.[27]

## B. Objections to Confirmation of Debtor's Third Amended Plan

### 1. General Standards Governing Confirmation of Subchapter V Chapter 11 Plans

Although a disclosure statement is not required in a Subchapter V case, a Subchapter V plan must include the information required by § 1190(1) and (2). Section 1190(1) provides that a plan shall include a brief history of the business operations of the debtor, a liquidation analysis, and financial projections that demonstrate the debtor's ability to make the plan payments. Section 1190(2) provides that the plan "shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan."

Section 1191 then governs confirmation of Subchapter V Chapter 11 plans. Under § 1191(a), the Court can confirm a plan as a consensual plan if

---

[27] *See In re Ozcelebi*, 639 B.R. 365, 395 (Bankr. S.D. Tex. 2022) ("The UST's allegations and arguments center around the misrepresentations and inaccuracies in the reports. Accordingly, the UST has not met its burden to establish by a preponderance of the evidence that cause exists to convert Debtor's case pursuant to § 1112(b)(4)(F).").

all the requirements of § 1129(a) other than (a)(15) are met.[28] Because of Debtor's agreement with the Subchapter V Trustee regarding payment of fees, and accepting votes from the only voting classes, Debtor appropriately seeks confirmation of the third amended plan as a consensual plan.

"The burden of proof is on Debtors to show they have satisfied the confirmation standards set forth in 11 U.S.C. §§ 1129 and 1191 by a preponderance of the evidence."[29] Debtor as plan proponent therefore has the burden of proof on each element of confirmation, by a preponderance of evidence.[30]

2. *Feasibility.*

The U.S. Trustee's primary focus at the evidentiary hearing was its allegation the third amended plan lacked feasibility. The U.S. Trustee argued Debtor's cash flow projections going forward acknowledge projected negative monthly income through June 2026, and looking backward, the MORs

---

[28] Per § 1191(b), the Court can confirm a plan as a *non*consensual plan if all the requirements of § 1129(a) other than (a)(8), (a)(10), and (a)(15) are met, if the plan does not discriminate unfairly and is fair and equitable as to each class of impaired claims that has not accepted the plan. The Subchapter V trustee fee payment issue is governed by § 1129(a)(9), so if Debtor had not reached an agreement on that issue, then Debor could not satisfy § 1129(a)(9) and would have had to seek confirmation as a nonconsensual plan.

[29] *In re Lost Cajun Enters., LLC*, 634 B.R. 1063, 1072 (Bankr. D. Colo. 2021).

[30] *In re Saratoga & N. Creek Ry.*, 635 B.R. 581, 601-02 (Bankr. D. Colo. 2022) (reviewing statutory confirmation standards in Chapter 11 and the applicable burden of proof).

15

consistently showed negative net income. As noted above, the U.S. Trustee also detailed how the historical MORs are not accurate, as Debtor has incurred debt throughout this case (e.g., by not paying rent and then not paying payroll taxes).

Section 1129(a)(11) requires as a condition of confirmation that the Court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The shorthand for § 1129(a)(11) is feasibility: the Code's feasibility requirement mandates a debtor must show "a realistic and workable framework for reorganization."[31] The purpose of the feasibility requirement is "to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."[32]

---

[31] *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 310–11 (B.A.P. 10th Cir. 2006) ("Feasibility is the shorthand term for the requirement of confirmation as set forth in § 1129(a)(11); it imposes a requirement that any plan must provide a realistic and workable framework for reorganization. A plan is considered feasible where it is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.").

[32] *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (internal quotation omitted).

16

Making a feasibility determination is fact intensive. A "bankruptcy court must carefully scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable."[33] To undertake this analysis, courts should consider a debtor's cash flow projections and ability to make plan payments and fund projected operations. The cash flow projections "must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic."[34] "While courts often do not require projections for the same period over which a long-term plan spans, a debtor must still sustain its burden to somehow prove that it will be able to perform all obligations it is assuming under the plan."[35] A debtor carries the burden of convincing the court its cash flow projections are grounded in historical facts and reasonable assumptions about future performance.[36]

As noted at the outset, the U.S. Trustee attacks feasibility based on both Debtor's negative historical performance, including insufficient

---

[33] *In re Inv. Co. of The Sw., Inc.*, 341 B.R. at 311.

[34] *Id.*

[35] *Id.*

[36] *See id.* ("A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible. On the other hand, when a court finds that the financial projections presented to support the plan are derived from realistic and reasonable assumptions which are capable of being met, the fact that unexpected events may defeat those projections does not make a plan unfeasible as a matter of law or fact." (internal quotations and alterations omitted))

17

operating revenues to pay expenses and failing to pay all postpetition expenses as they came due, and Debtor's projected negative monthly income in the cash flow projections going forward. In other words, the U.S. Trustee notes Debtor has not shown it can meet expenses in the past, and the projections attached to its third amended plan admit it will not meet expenses going forward, at least in the near-term.

The U.S. Trustee is of course correct that Debtor's postpetition cash flow has been insufficient to meet its operating expenses. Debtor does not dispute the only time it fully met its obligations postpetition was the first two months after it filed its petition in May 2024, in June and July 2024. From that point, despite Debtor's MORs showing a profit in July 2024 ($1656.92), October 2024 ($11,840.08), November 2024 ($5340.90), December 2024 ($24,681.45), February 2025 ($5406.32), March 2025 ($15,621.82), June 2025 ($6172.18), and July 2025 ($14,383.83), Debtor did not pay its $10,731 lease obligations those months, and so therefore the only months Debtor actually had a postpetition profit was just after filing in June and July 2024, and then in October 2024 (although just barely), December 2024, March 2025, and July 2025.

That said, it is also undisputed Debtor's monthly cash receipts have increased in the last few months. In July and August 2025, Debtor reported cash receipts over $70,000 a month. In September 2025, Debtor reported cash

receipts of $93,350.28. In October 2025, Debtor reported cash receipts of $90,491.93. The average of the July 2025 through October 2025 monthly cash receipts is $81,981.02. Importantly, the U.S. Trustee did not challenge the accuracy of Debtor's monthly projected expenses. Debtor projects its fixed and variable monthly expenses will be $59,358.75.[37] Debtor's plan payments will then total $30,702.93 until it sells certain equipment to reduce the claim of Emprise Bank, at which time the plan payments will fall to $18,666.53.[38] With the increased cash receipts reflected in the last several months of MORs, Debtor will be able to make its monthly payment obligations.

Debtor's cash flow projections in support of its third amended plan estimate $65,000 in monthly cash receipts from November 2025 through March 2026, then increasing to $70,000 per month beginning in April 2026. After payment of fixed and variable costs and making plan payments, Debtor

---

[37] Debtor's representative testified about the calculation of the fixed and variable costs. Debtor pulled its fixed costs from its records: *e.g.*, the lease costs came from the parties' contract, the insurance costs came from the billed amount from the insurance company. Regarding variable costs, such as the cost of goods sold, labor costs, and shop supplies, the numbers were computed by looking at historical data to determine the percentage those costs were of the income received, and Debtor then used those percentages against expected cash receipts going forward.

[38] As a result of Debtor's intent to sell certain equipment and therefore pay a portion of Emprise Bank's secured claim, in April 2026, Debtor believes its plan payment to Emprise Bank will decrease from $23,726.06 per month to $11,669.66 per month. Debtor believes the sale of the equipment will have no short-term impact on its operations, as the equipment is not currently being used, but it could have a long-term impact, if the item would be helpful in the development of a new product.

anticipates a net loss each month from January 2026 through June 2026; beginning to see a small monthly profit in July 2026 in conjunction with a reduction to its monthly plan payment to Emprise Bank as a result of the planned liquidation of a portion of the Bank's collateral and the increase in cash receipts it expects by that point.

Debtor acknowledges its tight budget in its cash flow projections, but counters that its monthly cash flow estimates used in the projections were conservative because it used a $65,000 per month estimate rather than the average supported by its MORs.[39] Debtor also contends it has a new project starting in the next month or so that will increase its cash flow even more, and Debtor believes once it is able to exit bankruptcy, its cash flow will increase further because it has heard from clients they are holding back because of the uncertainty with the bankruptcy, but would contract with Debtor once Debtor exits bankruptcy.

Finally, Debtor contends that its variable costs will decrease in 2026 and beyond, but the amounts were difficult to quantify. Those costs (such as

---

[39] As indicated above, the average cash receipts reported from May 2024 through September 2025 in Debtor's MORs was $68,349.15. Debtor's projected cash flow in support of its third amended plan uses a projected cash receipt of $65,000 per month for the first six months and then increases to $70,000 per month. And then the July through October 2025 supports an average cash receipt of $81,981.02. The Court notes the November 2025 MOR shows a decrease from this upward trend, *see* Doc. 480, but one bad month does not change the Court's analysis herein.

costs of goods and shop supplies) are already decreasing from historical averages, because they are high as a new product is developed because of the inputs required for a new project (e.g., a new tool), but decrease with repeat work. And because forty percent of Debtor's projects are currently repeat work, those variable costs are going down. Debtor's representatives credibly testified Debtor has stabilized its operations, and its back-to-basics business model is yielding returns: as Debtor is developing new work, about forty to fifty percent has turned into repeat customers, and as it develops parts, its statement of work is becoming larger. Debtor also notes that about fifty to sixty percent of its current jobs turn into long-term programs.

After weighing the evidence presented at the evidentiary hearing, the Court concludes confirmation of Debtor's third amended plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." As a result, the Court finds the requirements of § 1129(a)(11) are met. Debtor made significant progress in stabilizing and reorganizing its financial affairs by the time the third amended plan was considered. The cash flow projections in support of the third amended plan are conservative and reasonable, and while there is no guarantee of Debtor's success, Debtor's third amended plan offers a reasonable prospect of success, which is all that is required under the Code.

3. *Liquidation value.*

The U.S. Trustee also argued Debtor's third amended plan fails to pay the required liquidation value to unsecured creditors. Section 1190(1)(B) requires a Subchapter V plan to include a liquidation analysis. Section 1129(a)(7) then requires that each holder of a claim or interest in an impaired class either:

> (i)    has accepted the plan; or
>
> (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

This section, the best interests test, requires a debtor to show each holder of a claim in an impaired class that does not accept the proposed plan will receive not less than they would receive if the debtor were liquidated in a Chapter 7 proceeding.[40] "In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in

_____

[40] *In re Ditech Holding Corp*, 606 B.R. 544, 606-07 (Bankr. S.D.N.Y. 2019) ("[The best interests] test focuses on individual creditors rather than classes of claims and requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7. In that way, it is an individual guaranty to each creditor or interest holder that it will receive as much in reorganization as it would in liquidation." (internal quotations and alterations omitted).

the event of liquidation under chapter 7."[41] "In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."[42]

Here, the impaired class of allowed unsecured claims voted to accept Debtor's third amended plan.[43] The U.S. Trustee argues, however, the Liquidation Analysis attached to Debtor's third amended plan is flawed. The Court therefore assesses whether the Liquidation Analysis attached to Debtor's third amended plan accurately reflects what would be received by an unsecured creditor in a Chapter 7 liquidation.

The U.S. Trustee challenges three areas of Debtor's Liquidation Analysis. First, the Liquidation Analysis includes a line item for "finished goods," valued at $896,397.06, which represents inventory made for Spirit prior to the contract with Spirit being terminated before Debtor's first Chapter 11 case. The value used for the property came from Debtor's Schedules at filing, and is Debtor's estimate of the labor, materials, and process costs incurred in building the parts. Debtor acknowledges, however, it

---

[41] *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007). *See also In re Keenan*, 431 B.R. 308 (B.A.P. 10th Cir. 2009) (a "plan satisfies the best interests test if a mathematical comparison of the amount to be paid under the plan is not less than the hypothetical liquidation value of the property of the estate. Thus, the best interests test requires two separate calculations, which are then compared." (internal quotations omitted)).

[42] *In re Adelphia Commc'ns Corp*, 368 B.R. at 252.

[43] Doc. 171 p. 5.

23

would not recoup those costs if the finished products were sold on the open market—in fact, Debtor fully acknowledges there is little value to the "finished goods" on the open market because of their specialized nature.

Debtor believes all hope is not lost on selling this prepetition inventory, however. A large portion of the parts *could* be used in the production of a new airplane that *may* be developed by Spirit, and if so, Spirit would be shopping for a supplier for the parts. Debtor would have an advantage over other manufacturers, because not many other companies can make these items, and a portion of the goods involved to make the parts have a one-year lead time with a substantial qualification procedure to achieve, and so Debtor would be significantly ahead of others since it already possesses the materials and is qualified. Debtor's representatives credibly testified the likelihood of selling the parts was good. The timing of a potential sale, however, would be purely speculative, as Debtor's representatives understand it would be dependent on multiple factors, including a merger between Spirit and another industry player[44] and the development of the

---

[44] According to publicly available documents, Spirit did complete a merger with The Boeing Company on December 8, 2025. *See* Press Release, Boeing, Boeing Completes Acquisition of Spirit AeroSystems (Dec. 8, 2025), https://investors.boeing.com/investors/news/press-release-details/2025/Boeing-Completes-Acquisition-of-Spirit-AeroSystems/default.aspx.

new airplane at issue.[45]

The Court concludes the fair market value of the goods used for the Liquidation Analysis is grossly overstated. The cost and labor to make specialized parts is not at all reflective of fair market value for those parts many years later. Debtor's hope to someday sell the parts to Spirit was supported by no evidence that hope was realistic. The Court therefore concludes Debtor has significantly overstated its total asset value.

Debtor's Liquidation Analysis then deducts priority claims from its total asset value, and one of those priority claims is a claim from the Internal Revenue Service, listed as $544,777.30. The U.S. Trustee's second argument is that this priority claim is overstated, noting Debtor's third amended plan implies the priority tax claim could be as little as $144,160.59.

The evidence and testimony on the topic were minimal, and the Court was left to scour the record. The most recently amended IRS claim states the following unsecured priority claims:

| 2018 FICA taxes and interest:[46] | $38,370.27 |
| --- | --- |

---

[45] As a result, the third amended plan does not rely on Debtor selling this inventory and the Court does not consider it when determining the feasibility of Debtor's third amended plan.

[46] This figure consists of $12,226.17 interest for FICA taxes for tax period 9/30/2018, and $7206.28 FICA tax plus $18,937.82 interest for tax period 12/31/2018. Proof of Claim 6-5 p. 4.

| | |
|---|---|
| 2019 FICA taxes and interest:[47] | $105,790.32 |
| 2022 FICA taxes and interest:[48] | $122,238.69 |
| 2023 FICA taxes and interest:[49] | $240,961.18 |
| 2023 FUTA taxes and interest:[50] | $1073.47 |
| 2024 FICA taxes and interest:[51] | $35,958.10 |
| 2024 estimated FUTA taxes:[52] | $385.27 |
| Grand Total of Priority Claim: | $544,777.30 |

The $544,777.30 figure used in the Liquidation Analysis therefore comes from this proof of claim.

The third amended plan contains one sentence characterizing the IRS claim as containing "estimated taxes," and says Debtor has filed the appropriate returns which should "substantially reduce" the claim.[53] The

---

[47] This figure consists of $81,325.96 for FICA tax for tax period 3/31/2019 and interest of $24,464.36. *Id.*

[48] This figure consists of $65,495.56 for FICA tax for 6/30/2022 and $10,608.66 interest, plus $41,177.14 for FICA tax for 12/31/2022 and $4,957.33 interest. *Id.*

[49] This figure consists of $64,378.26 FICA tax and $6,371.65 interest for 3/31/2023, $73,085.32 FICA tax and $4,523.49 interest for 6/30/2023, $50,775.34 FICA tax and $2,154.79 interest for 9/30/2023, and $38,643.30 FICA tax and $1,029.03 interest for 12/31/2023. *Id.*

[50] This figure consists of $1046.73 FUTA tax and $26.74 interest for 12/31/2023. *Id.*

[51] This figure consists of $29,114.20 FICA tax and $742.05 interest for 3/31/2024 and $6,058 FICA tax and $43.85 interest for 6/30/2024. *Id.*

[52] This figure consists of an estimated FUTA claim for 12/31/2024, for the total of $385.27. *Id.*

[53] Doc. 160 p. 12.

third amended plan then states Debtor "will pay the IRS on the undisputed priority tax claim for FICA taxes for the 3rd Quarter 2018, the 4th Quarter 2018, and the 1st Quarter of 2019 in the amount of $144,160.59 over 60 months at 6.84% with monthly payments of $2,843.68 beginning 30 days from the Effective Date of this 3rd Amended Plan."[54] The U.S. Trustee understandably took this provision, in conjunction with the preceding statement about the "substantially reduced" claim, to mean the priority tax claim would be reduced to $144,160.59.

As noted above and in the IRS proof of claim, only the 2024 FUTA tax is stated as estimated, and it consists of only a small subset of the total claim: only $385.27 of the total $544,777.30 claim. The "reduced" number of $144,160.59 is the 2018 and 2019 FICA taxes. An additional provision from the third amended plan, several paragraphs from the above details, then also says: "Any remaining priority tax claim owed to the IRS, to which [Debtor] has not objected, will be paid over 60 months with 6.84% interest through monthly payments beginning on 30th day after the Effective Date of the 3rd Amended Plan or upon the allowance of such claim until paid in full."[55] The Court concludes the 2022 FICA, 2023 FICA, 2023 FUTA, and 2024 FICA

---

[54] *Id.*

[55] *Id.* p. 13.

would be paid under this provision, if they are not objected to and resolved through the claim objection process. The IRS claim has not been objected to, and therefore Debtor's Liquidation Analysis is currently only off by $385.27— the 2024 FUTA estimated tax amount.

But Debtor indicated at the evidentiary hearing that it may object to the IRS proof of claim, and testified that the 2022, 2023, and 2024 FICA taxes and interest had actually been paid, and only a new debt for the 2025 FICA taxes existed for the second and third quarter of 2025, not even reflected in the IRS proof of claim. In addition, Debtor's cash flow analysis includes only a plan payment for the 2018 and 2019 priority taxes of $144,160.59, with a monthly plan payment to the IRS of $2843.68. As a result, the Court concludes Debtor has overstated its priority claims, because it acknowledges it will object to a significant portion of the IRS proof of claim and is not planning to commit funds for the full amount claimed.

Finally, as pertinent herein, Debtor's Liquidation Analysis deducts a $170,493.85 "Auctioneer Commission," calculated as 6% of the total asset value at issue.[56] The U.S. Trustee argues the Liquidation Analysis overstates

---

[56] Debtor computes its total asset value as $2,841,564.24. Of that, only a 2005 Ford Diesel Fleet Truck valued at $8000 and miscellaneous equipment valued at $150,000 are fully unencumbered, while equipment and machinery valued at $1,306,000 are partially encumbered by liens totaling $688,672.06, leaving $617,927.94 of the machinery and equipment unencumbered. But again, because of

hypothetical Chapter 7 administrative expenses, arguing a Chapter 7 trustee would abandon the fully encumbered collateral and there would be no auction expenses. But it is undisputed that all Debtor's finished goods, machinery, and equipment are first pledged to Emprise Bank and then the SBA, and for a Chapter 7 trustee to realize any equity, the Chapter 7 trustee would need to sell the highly specialized property to attempt to realize any equity. A 6% auctioneer commission is not unreasonable, and the total asset value is highly variable and unknown. Although the total asset value is overstated due to the overstated value given the finished goods noted above, the amount is difficult to quantify.

Ultimately, Debtor's Liquidation Analysis estimates a negative liquidation value of ($147,891.43). After reducing the total asset value by a significant amount (reducing by the $896,397.06 value given for the finished goods), but then only reducing the amount of priority claims by a much smaller amount (reducing the IRS claims from $544,777.30 to $140,160.59), then even with a reduction to the auctioneer commission due to that reduced total asset value, the Court concludes unsecured creditors would receive more through the third amended plan than under a hypothetical Chapter 7 liquidation.

the overstated value given to the "finished goods," the Court concludes the total asset value is overstated.

29

As a result, the Court finds the requirements of § 1129(a)(7) are met. "The creation of a liquidation analysis and financial projections is not an exact science," and courts therefore typically defer to a debtor's projections for the analysis.[57] Considering no creditor rejected their treatment under Debtor's third amended plan, this Court does the same here.[58]

## IV.    Conclusion

The Court denies the U.S. Trustee's motion to dismiss[59] and overrules the objections to confirmation of Debtor's third amended plan.[60] Debtor should upload a confirmation order reflecting the agreements made to resolve the additional challenges to confirmation raised by the U.S. Trustee and the Subchapter V Trustee and announced as resolved.

**It is so Ordered.**

# # #

---

[57] *In re 303 Invs., Inc.*, 662 B.R. 1, 10 (Bankr. D. Colo. 2024).

[58] Because the impaired unsecured creditor class voted to accept their treatment under Debtor's third amended plan, § 1129(a)(7)(i) ("each holder of a claim or interest in an impaired class . . . has accepted the plan") is met, and the Court need not address the U.S. Trustee's final argument that unsecured creditor's delayed payment schedule does not account for the net present value of payments to impaired creditors, who will not receive their last payment under the third amended plan until 2031.

[59] Doc. 126.

[60] Doc. 160 (Debtor's Third Amended Subchapter V Plan), Doc. 169 (U.S. Trustee Objection to Confirmation), Doc. 170 (Subchapter V Trustee's Objection to Confirmation).

30